******************************************************

The "officially released" date that appears near the beginning of an opinion is the date the opinion will be published in the Connecticut Law Journal or the date it is released as a slip opinion. The operative date for the beginning of all time periods for the filing of postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying an opinion that appear in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced or distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

## STATE OF CONNECTICUT *v.* PATRICK A. GRIFFIN
### (AC 46982)

Moll, Westbrook and Prescott, Js.

*Syllabus*

Convicted, following a jury trial, of manslaughter in the first degree in connection with the stabbing death of the victim, the defendant appealed. On appeal, the defendant claimed, inter alia, that the trial court improperly instructed the jury on self-defense. *Held*:

The trial court properly instructed the jury that self-defense did not encompass a preemptive strike, as this court concluded that the trial court's instructions, when read as a whole, did not mislead the jury because the evidence adduced at trial raised a question of imminence and whether the defendant acted improperly by preemptively stabbing the victim in the absence of a reasonable belief that the victim posed an imminent threat of physical harm to the defendant, and the preemptive strike instruction was consistent with Connecticut law on self-defense.

The prosecutor's comments during rebuttal closing argument did not improperly infringe on the defendant's constitutional right to remain silent following warnings issued pursuant to *Miranda* v. *Arizona* (384 U.S. 436) because the comments would have naturally and necessarily been taken by the jury as commentary on the discrepancies between the defendant's statements on the night of the incident, which failed to include key facts relating to the defendant's claim of self-defense, and the defendant's trial testimony.

Argued February 14—officially released June 3, 2025

*Procedural History*

Substitute information charging the defendant with two counts of the crime of manslaughter in the first degree, brought to the Superior Court in the judicial district of Danbury and tried to the jury before *Pavia, J.*; verdict of guilty; thereafter, the court, *Pavia, J.*, vacated the defendant's conviction of one count of manslaughter in the first degree and rendered judgment of guilty of manslaughter in the first degree, from which the defendant appealed to this court. *Affirmed.*

*John L. Cordani, Jr.*, assigned counsel, with whom, on the brief, was *Scott T. Garosshen*, assigned counsel, for the appellant (defendant).

*Rocco A. Chiarenza*, senior assistant state's attorney, with whom, on the brief, were *David Applegate*, state's attorney, and *Russell Zentner*, senior assistant state's attorney, for the appellee (state).

*Opinion*

PRESCOTT, J. The defendant, Patrick A. Griffin, appeals from the judgment of conviction, rendered after a jury trial, of manslaughter in the first degree in violation of General Statutes § 53a-55 (a) (1).[1] On appeal, the defendant claims that (1) the trial court improperly instructed the jury that "self-defense does not encompass a preemptive strike" and (2) the state improperly infringed upon his constitutional right to remain silent when, in violation of *Doyle* v. *Ohio*, 426 U.S. 610, 619, 96 S. Ct. 2240, 49 L. Ed. 2d 91 (1976), it impermissibly commented on his post-*Miranda*[2] silence during rebuttal closing argument. We affirm the judgment of the trial court.

The jury reasonably could have found the following facts. On May 7, 2022, James Knapp, a retired schoolteacher, attended a stag party for one of his former students. Afterward, he met his longtime friend, the defendant, at a bar to watch the Kentucky Derby. The defendant consumed nine beers and one or two shots before leaving the bar at approximately 8:39 p.m. A few moments later, Knapp followed him out.

At approximately 8:47 p.m., the defendant, accompanied by Knapp, returned home in a highly inebriated state. Surveillance video from a camera on the defendant's house captured images and audio from the defendant's front yard and showed the defendant walking

---

[1] The defendant was also convicted of manslaughter in the first degree in violation of § 53a-55 (a) (3). For purposes of sentencing, the court vacated his conviction under § 53a-55 (a) (3).

[2] See *Miranda* v. *Arizona*, 384 U.S. 436, 478–79, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

with an unsteady gait from his vehicle up the front walkway. The defendant, while speaking on his cell phone with his wife, Pamela Drucker, shouted in slurred speech "Pam" and "fucking asshole," while forcefully tapping his cell phone as Knapp calmly said, "Hi, Pam." The defendant and Knapp entered the home.

At approximately 8:53 p.m., Knapp returned to his vehicle, closed the door, and walked through the gate and up the walkway to the front door. When Knapp reached the steps leading to the front door, he said to the defendant, who was laying down on the stoop, "get up, what are you doing?" The defendant continued to lie on the stoop groaning, and Knapp said, "you're drunk, can ya stand up?"

Shortly thereafter, Knapp said, "come on, I ain't gonna leave you out here. . . . It's too fucking cold." The defendant mumbled that he was "fucked up." Knapp stated to the defendant that the defendant would "pass out," that he did not "wanna carry" him into the house, and that, "you don't want me to drag you in." The defendant replied, "no, I'm up." Knapp then explained to the defendant, "that's home, c'mon, that's warmth, c'mon."

A few minutes later, the defendant went back into the house. Knapp then took the defendant's dog outside so that the dog could relieve himself. Knapp said to the dog "good boy," and then said, "go, get him." Knapp and the dog thereafter went back inside the house. Inside the house, the defendant, who was angry with Knapp for trying to drag him into the house, stabbed Knapp with a knife that he had hidden under a chair cushion.

At approximately 9:26 p.m., the defendant called 911 and stated that "there's a dead man in my kitchen" and that "my buddy was gonna kill me in the house but I switched it up and I stabbed him and I killed him . . .

because that's the way it went down." The defendant further told the dispatcher that, at the bar, "they" put something in his drink. The dispatcher told the defendant to wait outside for the police.

When the police arrived on the scene, the defendant was sitting on the front steps to his house while clad in boxer shorts and a T-shirt. He had defecated himself. The defendant immediately stated that his friend was dead because he had stabbed him and that his friend was in the kitchen.

The defendant stated to the police that Knapp was "[d]ragging me in. I'm shitting. And then I knew something was up. [Knapp] said, 'ah, fuck that. I don't give a shit if you're shitting in your pants.' " The defendant further stated, "when I get in there it's like [Knapp's] like 'ah, fuck you. Shut up.' And then I knew something was up. And then, when I started to get up and race in, he didn't know I had a knife underneath the fucking chair, and I grabbed it and fucking stabbed the fucker with it. And that's the way it went down, brother."

Trooper Nicanor Cardenas remained outside with the defendant and advised him of his *Miranda* rights, and the defendant responded that he understood those rights. Thereafter, the defendant stated repeatedly that Knapp dragged him up the walkway and into the house in order to kill him and that he grabbed a knife that he had hidden and stabbed Knapp with it. At some point, the defendant started screaming while mentioning the latex gloves that the police officers were wearing, and he yelled that someone needed to call 911.

The defendant was transported to Danbury Hospital, and, while there, he explained his version of events to Detective Jared Barbero. The defendant stated that Knapp was stomping on him and that he grabbed a knife because he had no other choice because Knapp's foot was placed on his throat.

Tammy Weiner, an emergency department physician at Danbury Hospital, treated the defendant. The defendant stated to Weiner that he had stabbed and killed his friend. The defendant reported pain in his hands, which were handcuffed behind his back, stating that he had broken one of his hands years ago. When the handcuffs were removed, the defendant stated that the pain was alleviated. The defendant's extremities had no evidence of swelling, there were shallow abrasions on his buttocks, and no abnormalities were noted on his neck.

At trial, the defendant testified to the following version of events: "Well, I fell. [Knapp] helped take my pants off, then he got shit on his hands, and then he snapped 'cause he got shit on his hands. He snapped and he started stomping on me, he [stated] fucking asshole, I got shit all over my hands, so he started stomping on me. Then he went into the kitchen, washed his hands, I guess. And he came back out and proceeded to just jump on me and stomp on me again. And when I was pinned between the TV stand and the chair and the woodstove so I was stuck; there was no way I could move. So, he was stomping on me. Then he slipped and when he slipped, he pushed the cushion open, and I saw the knife sitting there cause I sat up. And then I saw his—I grabbed the knife, and he grabbed the poker that was—you'll see it in the—video. Then I stabbed him to just slow him down so I can get away from him cause he was trying to crush my throat. He was stomping." On cross-examination, the defendant stated that he was intoxicated and in shock at the time that he spoke with the police and that he "said a lot of things on the tape then. Now that I've learned, it's a different story."

Following trial, the jury found the defendant guilty of, inter alia,[3] manslaughter in the first degree in violation of § 53a-55 (a) (1). The court, *Pavia, J.*, sentenced

[3] See footnote 1 of this opinion.

the defendant to twenty years of incarceration, execution suspended after sixteen years, with five years of probation. This appeal followed. Additional facts and procedural history will be set forth as necessary.

I

The defendant first claims that the court improperly instructed the jury that "self-defense does not encompass a preemptive strike." We are not persuaded that the court's instructions, when read as a whole, misled the jury.

We begin with the following relevant statutes, legal standards, and principles. "An improper instruction on a defense, like an improper instruction on an element of an offense, is of constitutional dimension. . . . In either instance, [t]he standard of review to be applied to the defendant's constitutional claim is whether it is reasonably possible that the jury was misled. . . . In determining whether it was . . . reasonably possible that the jury was misled by the trial court's instructions, the charge to the jury is not to be critically dissected for the purpose of discovering possible inaccuracies of statement, but it is to be considered rather as to its probable effect upon the jury in guiding them to a correct verdict in the case. . . . The charge is to be read as a whole and individual instructions are not to be judged in artificial isolation from the overall charge. . . . The test to be applied to any part of a charge is whether the charge, considered as a whole, presents the case to the jury so that no injustice will result." (Citations omitted; internal quotation marks omitted.) *State* v. *Prioleau*, 235 Conn. 274, 284, 664 A.2d 743 (1995). "[B]ecause a challenge to the validity of a jury instruction presents a question of law, we exercise plenary review." *State* v. *Jones*, 320 Conn. 22, 53, 128 A.3d 431 (2015).

General Statutes § 53a-19 (a) provides in relevant part that "a person is justified in using reasonable physical force upon another person to defend himself or a third person from what he reasonably believes to be the use or imminent use of physical force, and he may use such degree of force which he reasonably believes to be necessary for such purpose; except that deadly physical force may not be used unless the actor reasonably believes that such other person is (1) using or about to use deadly physical force, or (2) inflicting or about to inflict great bodily harm." The state bears the burden of disproving self-defense beyond a reasonable doubt. See, e.g., *State* v. *Hughes*, 341 Conn. 387, 397, 267 A.3d 81 (2021).

"It is well settled that under § 53a-19 (a), a person may justifiably use deadly physical force in self-defense only if he reasonably believes both that (1) his attacker is using or about to use deadly physical force against him, or is inflicting or about to inflict great bodily harm, and (2) that deadly physical force is necessary to repel such attack. . . .

"We repeatedly have indicated that the test a jury must apply in analyzing the second requirement, i.e., that the defendant reasonably believed that deadly force, as opposed to some lesser degree of force, was necessary to repel the victim's alleged attack, is a sub-jective-objective one. The jury must view the situation from the perspective of the defendant. Section 53a-19 (a) requires, however, that the defendant's belief ultimately must be found to be reasonable. . . .

"The subjective-objective inquiry into the defendant's belief regarding the necessary degree of force requires that the jury make two separate affirmative determinations in order for the defendant's claim of self-defense to succeed. First, the jury must determine whether, on the basis of all of the evidence presented, the defendant

in fact had believed that he had needed to use deadly physical force, as opposed to some lesser degree of force, in order to repel the victim's alleged attack. . . . If the jury determines that the defendant had not believed that he had needed to employ deadly physical force to repel the victim's attack, the jury's inquiry ends, and the defendant's self-defense claim must fail. If, however, the jury determines that the defendant in fact had believed that the use of deadly force was necessary, the jury must make a further determination as to whether that belief was reasonable, from the perspective of a reasonable person in the defendant's circumstances." (Internal quotation marks omitted.) *State* v. *O'Bryan*, 318 Conn. 621, 632, 123 A.3d 398 (2015).

In the present case, the defendant requested a self-defense charge. In response, the state requested that the jury be charged on the initial aggressor doctrine, a statutory exception to the right to use self-defense. Under that exception, a person generally is not justified in using physical force and, thus, is not acting in self-defense if he is the initial aggressor in the confrontation. See General Statutes § 53a-19 (c) (2). In support of this request, the state relied on the defendant's statement to the police that, when Knapp dragged him up the walkway and told him to "shut up," the defendant went into the house, noted that Knapp "didn't know I had a knife underneath the fucking chair," and stabbed Knapp with the knife.

In denying the state's request for an initial aggressor instruction, the court stated "it really comes down to this. That statement does not talk about a confrontation. It really negates self-defense in that it's saying I just decided to stab him." The court further stated, "I'm not sure that it really goes to an initial aggressor . . . as much as it goes to the fact that of whether or not self-defense is—is even an appropriate defense." The state then requested that the court charge that "self-defense

does not encompass a preemptive strike." The defendant objected to the preemptive strike instruction, arguing that the facts of the case did not warrant such an instruction. The trial court stated that it would charge the jury that "self-defense does not encompass a preemptive strike."

The court instructed the jury on self-defense as follows: "The statute requires that before a defendant uses physical force upon another person to defend himself, he must have two reasonable beliefs. The first is a reasonable belief that the physical force is—I'm sorry. A reasonable belief that physical force is then being used, or about to be used, upon him. The second is a reasonable belief that the degree of force he is using to defend himself from what he believes to be an ongoing or imminent use of force is necessary for that purpose." The court then defined "deadly physical force," "nondeadly physical force," "physical injury," and "reasonable belief."

The court then stated that "the defense of self-defense has four elements. The first element is that the defendant used defensive force against James Knapp—I'm sorry. I'm going to say that again. Is that when the defendant used defensive force against James Knapp, he actually believed that the other person was using physical force against him, or that the use of physical force against him was imminent.

"The word imminent means that the person is about to use physical force at that time and not at some unspecified future time.

"If you have found that the force used by the defendant was deadly physical force, then you must find that the defendant actually believed that James Knapp was not only using or about to use physical force upon him, but that the other person was either using or about to use deadly physical force against him, or inflicting or about to inflict great bodily harm upon him. The term

great has its ordinary meaning and indicates a bodily harm that is substantially more than minor or inconsequential harm.

"The act of leading to the defendant's use of defensive physical force need not be an actual threat or assault. The test is not what the other person actually intended, but what the other person's act caused the defendant to believe was the intention of the other. In other words, the danger to which the defendant was reacting need not have been actual or real.

"In judging the danger to himself, the defendant is not required to act with infallible judgment. A person acting in self-defense is sometimes required to act instantly and without time to deliberate and investigate. Under such circumstances it is possible to perceive an actual threat when none in fact exists. *The defense of self-defense however does not encompass a preemptive strike.*" (Emphasis added.) The court then stated that "the second element is that the defendant's actual belief about the force being used or about to be used against him was a reasonable belief." Subsequently, the court discussed the third and fourth elements of whether the defendant actually believed the degree of force he used was necessary and whether that actual belief was a reasonable belief.

Our Supreme Court has stated on a number of occasions that "[t]he defense of self-defense does not encompass a preemptive strike . . . ." (Internal quotation marks omitted.) *State* v. *Hargett*, 343 Conn. 604, 621, 275 A.3d 601 (2022); see also *State* v. *Jones*, supra, 320 Conn. 54; *State* v. *Lewis*, 245 Conn. 779, 813, 717 A.2d 1140 (1998); *State* v. *Lewis*, 220 Conn. 602, 620, 600 A.2d 1330 (1991). On appeal, the defendant concedes that it is legally correct that, under Connecticut law, self-defense does not encompass a preemptive strike but argues that such an instruction was nonethe-

less improper under the facts and circumstances of the present case. He contends that a preemptive strike is "another way of talking about the requirement of imminence as a condition for the use of self-defense. A person is justified in using force to prevent *imminent* threat of injury" and that the court did not give the preemptive strike instruction in the context of imminence but rather in the context of whether the defendant reasonably had perceived a threat from Knapp. (Emphasis in original.)

The defendant argues that, because the preemptive strike instruction was given in such context, it "played directly into the state's argument that, under [the defendant's] account, Knapp had not yet drawn the fire poker from its stand. . . . But it is this sense of 'preemptive strike' that would mislead the jury about the law. A person is not required to wait until the last possible second (until after a weapon has been drawn and readied for use) to defend himself. Such a person can strike first to preempt the imminent use of force against him." (Citation omitted.) He contends that the instruction improperly suggested "that, if Knapp had not yet drawn the poker, then [the defendant's] actions did not amount to self-defense, *even if the jury believed* [*the defendant's*] *account*. The jury was left to believe that preemptive strike is not allowed when one is evaluating the attacker's intentions in the heat of the moment. This was incorrect." (Emphasis in original.) The defendant's claim is flawed for two reasons. First, the premise of the defendant's claim that the court's instruction was divorced from its discussion of imminence is simply not accurate. The court's preemptive strike instruction occurred when the court was discussing the concept of imminence and prior to the court stating that it was then turning to the element of self-defense regarding whether the defendant had a reasonable belief that use of deadly physical force was necessary. The preemptive

strike instruction was given in close proximity to the court's defining of the word "imminent." The court made clear in its instruction on imminence that the defendant was not required to act with infallible judgment but rather that a person acting in self-defense must sometimes act instantly and without time to deliberate and investigate and that, under such circumstances, it is possible to perceive an actual threat when none in fact exists.

It perhaps would have been clearer for the court to have employed the preemptive strike language immediately after mentioning and defining the term imminence or, alternatively, not to have used the phrase at all.[4]

[4] The cases that discuss a "preemptive strike" do so not in the context of whether a preemptive strike jury instruction was proper, but rather in other contexts, such as whether the defendant was entitled to an instruction on self-defense at all. See *State* v. *Hargett*, supra, 343 Conn. 616–25 (analyzing claim that trial court incorrectly concluded that there was insufficient evidence to entitle defendant to self-defense instruction); *State* v. *Lewis*, supra, 245 Conn. 809–13 (analyzing claim that trial court improperly failed to charge jury on self-defense); *State* v. *Lewis*, supra, 220 Conn. 617–20 (analyzing claim that trial court improperly failed to instruct on elements of self-defense); *State* v. *Grasso*, 189 Conn. App. 186, 197–222, 207 A.3d 33 (analyzing claim that state failed to disprove beyond reasonable doubt that defendant acted in self-defense), cert. denied, 331 Conn. 928, 207 A.3d 519 (2019); *Daniel* v. *Commissioner of Correction*, 57 Conn. App. 651, 674–76, 751 A.2d 398 (analyzing claim of ineffective assistance of counsel for failure to investigate and advance theory of self-defense), cert. denied, 254 Conn. 918, 759 A.2d 1024 (2000); *State* v. *Carter*, 34 Conn. App. 58, 64–68, 640 A.2d 610 (1994) (analyzing claim that trial court improperly refused to instruct jury on issue of self-defense), rev'd, 232 Conn. 537, 656 A.2d 657 (1995).

In *State* v. *Jones*, supra, 320 Conn. 22, our Supreme Court, when determining that there was no reasonable possibility that the jury was misled by the court's instruction on the initial aggressor exception to self-defense, stated that "[t]he defense of self-defense does not encompass a preemptive strike" to provide support for the proposition that "the use of physical force in defense of oneself is justified only if the person claiming self-defense honestly and reasonably believes that an attack is imminent." (Internal quotation marks omitted.) Id., 54. This case does not address the propriety of a preemptive strike instruction, but it reenforces the connection of the concept of a preemptive strike to the notion of imminence.

None of these cases, however, contains a review of the propriety of a jury instruction using the preemptive strike language. It may be better practice

The difficulty with using the phrase "preemptive strike" as shorthand for the lack of imminence is that it is possible to construe it in two ways. It can mean that a defendant is justified in using a preemptive strike when he is facing an imminent attack. It can also be used as shorthand to describe an impermissible use of self-defense because there is no imminent attack. In the present case, however, as discussed previously, it is not reasonably probable, in light of the court's self-defense instruction as a whole, that the jury was misled.

Second, the evidence adduced at trial raised a question of imminence and a preemptive strike instruction was consistent with Connecticut law on self-defense. The defendant admitted that he had stabbed Knapp and the question before the jury was whether the stabbing was done in self-defense. At trial, the defendant testified that Knapp helped him remove his pants after he had defecated himself, but that Knapp "snapped" when he got feces on his hands and "started stomping" on the defendant. The defendant testified that Knapp went to the kitchen to wash his hands and, when Knapp returned to the living room, he continued to stomp on the defendant and tried to crush his neck. The defendant stated that when Knapp reached for the fireplace poker, he grabbed a knife that had been revealed when Knapp slipped and inadvertently moved a couch cushion. The defendant's trial testimony, which is the only version of events in which a fireplace poker is mentioned, raises a question of self-defense. This version of events, however, was not the only one before the jury.

A question of whether the stabbing was unlawfully preemptive arises when the defendant's trial testimony is viewed in light of the evidence adduced at trial that

to refrain from using the phrase "preemptive strike" in jury instructions or to do so only if the language is crystal clear that a preemptive strike is the use of force by a defendant when there is no imminent threat of injury to him.

Knapp's body was found in the kitchen and that the defendant was largely lacking in injuries and had no injuries to his neck.[5] If the jury discredited the portion of the defendant's testimony that Knapp, after washing his hands in the kitchen, returned to the living room and stomped on the defendant while placing his foot on the defendant's neck and grabbing for the fireplace poker, then a question arises of whether the defendant stabbed Knapp after Knapp went into the kitchen to wash his hands.

The version of events that the defendant told the police essentially amounts to him admitting that he decided to stab Knapp. The defendant explained to the police on the night of May 7, 2022, that Knapp dragged him into the house and that the defendant ran into the house, found a knife, and stabbed Knapp. This scenario does not involve Knapp reaching for a fireplace poker. On cross-examination, the defendant, after watching the surveillance video of the night in question, stated that his statement to the police that Knapp had dragged him up the walkway was not true. The defendant stated that he went inside the house and stabbed Knapp, after Knapp said, "ah, fuck you" and "shut up." Certainly, this raised a question for the jury of whether the strike was improperly preemptive because any physical force by Knapp against the defendant was not imminent.

In sum, the evidence presented multiple factual scenarios before the jury and raised a question of imminence and whether the defendant acted improperly by preemptively stabbing Knapp in the absence of a reasonable belief that Knapp posed an imminent threat of physical harm to the defendant. Accordingly, the defendant's claim of instructional error fails.

---

[5] The defense introduced into evidence photographs taken by a defense investigator on the day of the defendant's arraignment, which defense counsel argued supported his version of events that Knapp had attacked him. The photographs do not depict the defendant's neck.

## II

The defendant next claims, relying on *Doyle* v. *Ohio*, supra, 426 U.S. 610, that the state improperly infringed on his constitutional right to remain silent when, during rebuttal closing argument, it impermissibly commented on his post-*Miranda* silence. We conclude that the defendant's unpreserved claim fails under the third prong of *State v. Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989), as modified by *In re Yasiel R.*, 317 Conn. 773, 781, 120 A.3d 1188 (2015).

The defendant seeks *Golding* review of his unpreserved claim. "Under *Golding*, a defendant can prevail on a claim of constitutional error not preserved at trial only if all of the following conditions are met: (1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude, alleging the violation of a fundamental right; (3) the alleged constitutional violation . . . exists and . . . deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt. . . . The first two *Golding* requirements involve whether the claim is reviewable, and the second two involve whether there was constitutional error requiring a new trial." (Internal quotation marks omitted.) *State* v. *Devito*, 159 Conn. App. 560, 568, 124 A.3d 14, cert. denied, 319 Conn. 947, 125 A.3d 1012 (2015). The record is adequate for review of the defendant's claim because it contains the full transcript of the defendant's criminal proceedings. The claim, which alleges a due process violation, is of constitutional magnitude. See id.

The following legal principles guide our analysis of the third prong of *Golding*. "[In] *Doyle* v. *Ohio*, supra, 426 U.S. 611 . . . the United States Supreme Court held that the impeachment of a defendant through evidence

of his silence following his arrest and receipt of *Miranda* warnings violates due process. . . . [T]he holding in *Doyle* was based on two considerations: First, [*Doyle*] noted that silence in the wake of *Miranda* warnings is insolubly ambiguous and consequently of little probative value. Second and more important[ly], it observed that [although] it is true that the *Miranda* warnings contain no express assurance that silence will carry no penalty, such assurance is implicit to any person who receives the warnings. In such circumstances, it would be fundamentally unfair and a deprivation of due process to allow the arrested person's silence to be used to impeach an explanation subsequently offered at trial." (Internal quotation marks omitted.) *State* v. *Patrick M.*, 344 Conn. 565, 582, 280 A.3d 461 (2022).

"[O]ur Supreme Court has recognized that it is also fundamentally unfair and a deprivation of due process for the state to use evidence of the defendant's post-*Miranda* silence as affirmative proof of guilt . . . . *Miranda* warnings inform a person of his right to remain silent and assure him, at least implicitly, that his silence will not be used against him. . . . [A]s a factual predicate to an alleged *Doyle* violation, the record must demonstrate that the defendant received a *Miranda* warning prior to the period of silence that was disclosed to the jury." (Internal quotation marks omitted.) *State* v. *Reddick*, 174 Conn. App. 536, 553, 166 A.3d 754, cert. denied, 327 Conn. 921, 171 A.3d 58 (2017), cert. denied, 583 U.S. 1135, 138 S. Ct. 1027, 200 L. Ed. 2d 285 (2018).

In *State* v. *Silano*, 204 Conn. 769, 783–84, 529 A.2d 1283 (1987), our Supreme Court made an important distinction between a prosecutor's comments concerning prior inconsistent statements made by a defendant and a prosecutor's comments on the defendant's post-*Miranda* silence. Although the *Doyle* claim in *Silano* arose in the context of a prosecutor's cross-examination

of the defendant, the analysis in *Silano* is equally applicable to the present case involving remarks made by a prosecutor during closing argument. In that case, our Supreme Court stated: "The state may impeach a defendant by cross-examination concerning a prior inconsistent statement made after arrest and the giving of *Miranda* warnings, even though such impeachment may call into question a defendant's silence about the truth when he made that prior inconsistent statement. . . . Such an examination is allowed because it is impossible to bifurcate a prosecutor's questions concerning inconsistency into those relating to facts contained in a prior statement and those concerning facts omitted therefrom. . . . A prosecutor may not, however, question a defendant about his silence after the interrogation has ceased, since a defendant may reassert his right to remain silent at any time, and if he ceases to answer questions, or to come forward with additional or correcting information after questions are no longer being asked of him, there is a reasonable possibility that he is relying upon that right." (Citations omitted; internal quotation marks omitted.) Id., 780–81.

The defendant challenges the following italicized remarks made by the prosecutor during rebuttal argument. In the first comment, the prosecutor stated: "It's amazing, that kind of detail he has, and can't remember anything else, and says this *for the first time*. Amazing. There's no mention of a struggle *until Friday*. There's no mention of a poker—a fireplace poker. There's no mention of my dog likes me more than you by Mr. Knapp. Who doesn't he mention it to? This is all the people he had a chance to speak to. Here we go. The 911 dispatcher, Trooper Tharas, Trooper Cardenas, Detective Barbero, Doctor Tammy Weiner, the ER physician. None of this is mentioned to those five people. Not a word. Almost three hours, when it's fresh in his mind, nothing." (Emphasis added.)

In the second comment, the prosecutor stated: "If you want to slow him down, why don't you aim for his leg? He grabs a poker. That's your claim? And *but you don't tell anybody else until eleven and half months later, and that's suddenly it? When he testifies in court.* He doesn't tell anybody that night, when speaking to five different people." (Emphasis added.)

In the third comment, the prosecutor stated: "Think about all the holes in this case. No mention of a poker. No mention of a struggle. *No mention of any of this stuff, until he testifies today,* to the five people he spoke to in almost three hours. None of that." (Emphasis added.)

On appeal, the defendant argues that the prosecutor did not violate *Doyle* by commenting on what the defendant said or omitted during his statements to the police on May 7, 2022, but that the prosecutor violated *Doyle* by "choos[ing] to take [the defendant] to task for, after that night, waiting until trial to present his side of the facts." The defendant argues that "[t]he prosecutor's comments in this case are directly analogous to those used in [*State* v.] *Patrick M.*, [supra, 344 Conn. 565]."

To resolve this issue, we must determine whether the prosecutor permissibly commented on the inconsistencies between the defendant's statements to the police and his trial testimony or impermissibly commented on the defendant's post-*Miranda* silence following his statements to the police. In determining whether the prosecutor's ambiguous comments violate *Doyle*, we must "analyze whether the language used [by the prosecutor was] manifestly intended to be, or was . . . of such a character that the jury would *naturally and necessarily* take it to be a comment on the [defendant's post-*Miranda* silence]. . . . [I]n applying this test, we must look to the context in which the statement was made in order to determine the manifest

intention [that] prompted it and its natural and necessary impact [on] the jury." (Emphasis in original; internal quotation marks omitted.) Id., 588.

In *Patrick M.* the defendant claimed that he was deprived of his due process right to a fair trial by the prosecutor's commentary on his post-*Miranda* silence. Id., 581. The defendant exercised his right to remain silent and broke that silence when he testified at trial. Id., 578. The question in that case was whether the prosecutor's ambiguous remarks constituted permissible commentary on the defendant's pre-*Miranda* silence or impermissible and unconstitutional commentary on his post-*Miranda* silence. Id., 583–84. Our Supreme Court determined that "some of the prosecutor's comments, specifically the ones that emphasized that 'today' or 'this morning' was the 'first time' that the defendant told his story, naturally and necessarily would have been construed by the jury as commentary on the defendant's post-*Miranda* silence. This conclusion is compelled by the repeated, unmistakable emphasis that the prosecutor placed on the recency of the defendant's disclosure of his exculpatory version of events." Id., 589. The court concluded that the prosecutor's comments violated *Doyle* and that the state failed to fulfill its burden of demonstrating harmlessness. Id., 588–93.

As articulated by our Supreme Court in *Patrick M.*, the naturally and necessarily test depends heavily on context. Id., 588; see id. ("[i]n applying this test, we must look to the context in which the statement was made in order to determine the manifest intention [that] prompted it and its natural and necessary impact [on] the jury" (internal quotation marks omitted)); see also *State* v. *Devito*, supra, 159 Conn. App. 572 (concluding that no *Doyle* violation occurred because, "[g]iven the context in which the question was asked . . . it is more

probable that it would have been understood to refer to the defendant's prearrest silence").

*Patrick M.* is distinguishable from the present case because, in that case, unlike the present case, the defendant had not made any statements to the police that were arguably inconsistent with his trial testimony. In the present case, it was fair game for the prosecutor to argue that the defendant had left out important details in his voluntary statements to the police that were later included in his trial testimony. The prosecutor's comments in the present case are heavily ladened with descriptions of the individuals with whom the defendant spoke on May 7, 2022, and what factual details the defendant failed to mention to these individuals but instead were self-servingly disclosed in his trial testimony, such as detailing that Knapp had wielded the fireplace poker.

In other words, the most reasonable import of the prosecutor's comments was that they highlighted the inconsistencies between the defendant's May 7, 2022 statements and his trial testimony. The prosecutor's comments would not naturally and necessarily have been taken by the jury as commentary on the defendant's silence after having spoken to the police or, in other words, his decision not to later and voluntarily come forward to inform the police about the fireplace poker. Rather, these arguments would naturally and necessarily have been taken by the jury as commentary on the discrepancies between the defendant's statements on May 7, 2022, and his trial testimony. It simply does not violate *Doyle* for the prosecutor to highlight inconsistencies between the defendant's out-of-court statements that are admitted at trial and his trial testimony. See *State* v. *Casey*, 201 Conn. 174, 185, 513 A.2d 1183 (1986) ("[t]he fact that the defendant failed to mention [a certain incident] during police questioning

but testified to that incident during his trial is the equivalent of having given inconsistent statements for the purposes of [*Doyle*]"). Accordingly, the defendant's claim fails under the third prong of *Golding*.

The judgment is affirmed.

In this opinion the other judges concurred.