******************************************

The "officially released" date that appears near the beginning of an opinion is the date the opinion will be published in the Connecticut Law Journal or the date it is released as a slip opinion. The operative date for the beginning of all time periods for the filing of postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying an opinion that appear in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced or distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************

## STATE OF CONNECTICUT *v.* WILLIAM A.*
## (AC 47138)

Alvord, Clark and Seeley, Js.

*Syllabus*

Convicted, following a jury trial, of the crimes of sexual assault in the fourth degree and risk of injury to a child, the defendant appealed. He claimed, inter alia, that the state deprived him of his fifth amendment right to remain silent when the prosecutor impermissibly asked a question and elicited testimony about the defendant's silence occurring after he had been informed of his rights under *Miranda* v. *Arizona* (384 U.S. 436), in violation of *Doyle* v. *Ohio* (426 U.S. 610), during the state's case-in-chief and commented about the defendant's post-*Miranda* silence during closing argument. *Held*:

This court reviewed the merits of the defendant's unpreserved claim of a *Doyle* violation pursuant to *State* v. *Golding* (213 Conn. 233), as it was of constitutional magnitude and the record was adequate to review the alleged claim of error.

This court, having concluded that the defendant had established the existence of a constitutional violation that violated his due process right to a fair trial for purposes of the third prong of *Golding*, further concluded that the state failed to meet its burden of proof that the *Doyle* violation was not harmless beyond a reasonable doubt, as the state's case against the defendant was not particularly strong and the prosecutor made multiple remarks concerning the defendant's post-*Miranda* silence, which struck at the jugular of the defendant's theory of defense or suggested a connection between the defendant's silence and his guilt; accordingly, this court reversed the judgment of the trial court and remanded the case for a new trial.

Argued March 11—officially released September 2, 2025

* In accordance with our policy of protecting the privacy interests of the victims of sexual assault and the crime of risk of injury to a child, we decline to use the defendant's full name or to identify the complainant or others through whom the complainant's identity may be ascertained. See General Statutes § 54-86e.

Moreover, in accordance with federal law; see 18 U.S.C. § 2265 (d) (3) (2018), as amended by the Violence Against Women Act Reauthorization Act of 2022, Pub. L. No. 117-103, § 106, 136 Stat. 49, 851; we decline to identify any person protected or sought to be protected under a protection order, protective order, or a restraining order that was issued or applied for, or others through whom that person's identity may be ascertained

*Procedural History*

Substitute information charging the defendant with the crimes of sexual assault in the fourth degree and risk of injury to a child, brought to the Superior Court in the judicial district of New London, geographical area number twenty-one, and tried to the jury before *Papastavros, J.*; verdict and judgment of guilty; thereafter, the court denied the defendant's motion for a new trial, and the defendant appealed to this court. *Reversed*; *new trial.*

*Conrad O. Seifert*, assigned counsel, for the appellant (defendant).

*Olivia M. Hally*, deputy assistant state's attorney, with whom, on the brief, were *Paul Narducci*, state's attorney, and *Adam B. Scott*, supervisory assistant state's attorney, for the appellee (state).

*Opinion*

SEELEY, J. The defendant, William A., appeals from the judgment of conviction, rendered after a jury trial, of sexual assault in the fourth degree in violation of General Statutes § 53a-73a (a) (1) (A) and risk of injury to a child in violation of General Statutes § 53-21 (a) (2). On appeal, the defendant claims that (1) pursuant to *Doyle* v. *Ohio*, 426 U.S. 610, 619, 96 S. Ct. 2240, 49 L. Ed. 2d 91 (1976),[1] the state violated his fifth amendment right to remain silent when the prosecutor impermissibly asked a question and elicited testimony during the state's case-in-chief and commented during closing argument about the defendant's post-*Miranda*[2] silence,

---

[1] "In *Doyle* v. *Ohio*, supra, 426 U.S. [619], the United States Supreme Court held that the impeachment of a defendant through evidence of his silence following his arrest and receipt of *Miranda* warnings violates due process." *State* v. *Washington*, 345 Conn. 258, 267, 284 A.3d 280 (2022).

[2] See *Miranda* v. *Arizona*, 384 U.S. 436, 478–79, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966) (person who has been taken into custody or otherwise deprived of his freedom in any significant way "must be warned prior to any questioning that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of

(2) the prosecutor's improper question about the defendant's post-*Miranda* silence implicated the defendant's constitutional right to have the state prove his guilt beyond a reasonable doubt and thereby implied that the defendant had to prove his innocence, in violation of *In re Winship*, 397 U.S. 358, 364, 90 S. Ct. 1068, 25 L. Ed. 2d 368 (1970),[3] (3) the prosecutor engaged in improprieties during the trial and closing argument that deprived the defendant of his due process right to a fair trial, and (4) the trial court committed plain error by instructing the jury on consciousness of guilt when there was no evidence to support such an instruction and the instruction did not comply with the model Connecticut Criminal Jury Instructions. We agree that the prosecutor impermissibly asked a question and elicited testimony about the defendant's post-*Miranda* silence in violation of *Doyle* and conclude that the state has failed to meet its burden of demonstrating that the constitutional violation was harmless beyond a reasonable doubt. Accordingly, we reverse the judgment of conviction and remand the case for a new trial.[4]

The jury reasonably could have found the following facts. On October 29, 2020, the complainant, K, who was sixteen years old at the time, told her mother that she did not want to take the bus home from school. Although her mother told her that she had to, K did not take the bus home, and she subsequently lied to her mother about having done so. When K's mother

an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires").

[3] In *In re Winship*, supra, 397 U.S. 364, the United States Supreme Court held "that the [d]ue [p]rocess [c]lause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged."

[4] Because we agree with the defendant's claim that the prosecutor violated *Doyle* by impermissibly asking a question and eliciting testimony about the defendant's post-*Miranda* silence and remand the case for a new trial, we do not reach the merits of his other claims on appeal.

confronted K, K acknowledged that she did not take the bus. K's mother punished K by taking her cell phone away from her for one month. That same day, K told her mother information about her sexual orientation. K's mother was supportive but thought that K might have made that statement in an effort to get her cell phone back. The next day, K revealed to her mother that the defendant, her stepfather, had touched her inappropriately when she was younger. K's mother also thought that, in making these allegations, "[K] could be attempting to have her phone returned to her." K testified at trial that she came forward out of concern for her sister, who is autistic, in case the defendant had done the same thing to her.

In her trial testimony, K described an incident that occurred in April, 2013, when she was eight years old and had stayed home from school due to a lung infection. According to K, she used to get sick a lot because she has asthma, and, on that particular day when she stayed home, she and the defendant were the only two people in the house. K was lying underneath a blanket in a chair in the living room watching television while the defendant, who had worked the night shift, was sleeping. When the defendant woke up, he came into the living room and sat down on a couch that was across from K. After a few minutes passed, the defendant got up, lay down next to K, and then slid his hands underneath the waistband of K's leggings and underwear. The defendant left his hand there for a time and then began to "try and feel" K's vagina, but her legs were closed, and, when she noticed what he was trying to do, she sat up and took a drink of water to try and indicate to the defendant that she was uncomfortable with his conduct. K then moved to the couch on the opposite side of the room, and the defendant followed her, lay on top of her, stuck his hands down her leggings and underwear again, and started touching her vagina. K

responded by getting up and sitting on the other couch, but the defendant followed her again, repeated the same behavior, and began moving his hand back and forth while touching her vagina. Thereafter, K got up and went to the bathroom to "be safe . . . ." In the bathroom, K decided to take a shower. While in the shower, she realized that she did not have a washcloth and asked the defendant to bring her one. When the defendant entered the bathroom to give K a washcloth, K covered her body with the shower curtain and extended her arm over the curtain to take the washcloth from the defendant. After having done so, however, K noticed that the defendant had not left the bathroom and was still standing there, which prompted her to say something to the effect of: "[A]re you just going to stand there?" Thereafter, the defendant left the bathroom. K testified that, after this incident, she did not want to have contact with the defendant but acknowledged that she would ask to go along with him when he would pick up his daughter in Maryland. During those long road trips, she would be alone with the defendant in the car, but nothing happened between her and the defendant on those trips.

K also described an incident in which the defendant allegedly touched her on her leg. When K was between thirteen and fourteen years old, she was sleeping in her mother's bed with her mother while the defendant was at work because she was afraid of the dark. When the defendant arrived home from work, he got into the bed and lay in between K and her mother, with the front of his body positioned against the back of K's body. K, who was awake, felt the defendant start to slide his hand down her leg, but she got out of the bed and went to her bedroom before he could touch her further. K's mother recalled a time when K was a teenager and the defendant lay in bed with the both of them. K's mother testified that, the next morning, she told the defendant

that she felt it was inappropriate for him to be in bed with K because she was a teenager, and he agreed. K testified that, apart from these two instances, there were no other times when the defendant touched her inappropriately.

After K's disclosure, K's mother informed the defendant of K's allegations, and he denied them. The next day, K's mother made a report to the Department of Children and Families, which informed the Norwich Police Department. On November 6, 2020, K's mother was interviewed by John Tangney, a patrol officer with the Norwich Police Department, and she conveyed to him K's account of what had occurred. See footnote 7 of this opinion. A forensic interview of K subsequently was conducted.

On February 10, 2021, the defendant voluntarily went to the Norwich Police Department for the purpose of being interviewed about K's allegations. The interview was conducted by Peter Karasik, the detective assigned to the case, and another detective. At the outset of the interview, Karasik informed the defendant that he was not under arrest, that he was free to go at any time, and that the door to the interview room had been closed for privacy purposes. During the interview, which lasted approximately one hour and fifteen minutes, the defendant was asked repeatedly about the allegations, and each time he responded by denying that anything inappropriate had happened. At least twenty-six times during the course of the interview the defendant denied K's allegations.[5] The defendant also was asked multiple times why K would make up the allegations or lie. He consistently responded that he did not know why and

[5] Specifically, the defendant stated that nothing happened, K's allegations were not true, there was nothing that could be construed as inappropriate, he never put his hand on K's thigh, never got into bed with K, never saw K come out of the shower or hand her a washcloth while she was in the shower, and the couch and bathroom incidents did not happen.

mentioned how K often asked to join him on long road trips when he would drive out of state to pick up his daughter, and it would be just the two of them in the car, and that such road trips occurred after the alleged sexual abuse took place. At several points in the interview, the defendant also speculated that maybe K did not like that he was her stepfather, especially when she did not get her way; was covering for someone else, including a boyfriend; was trying to make her allegations appear credible; was trying to get the defendant "away from her mother . . . to get her parents back together"; was describing a bad dream; or was looking for attention. Nevertheless, one of the detectives stated that they needed to be able to give their boss a "reasonable explanation" as to why they should believe the defendant over K, and that, if they could not explain why K was making up the allegations, they could "only assume [the allegations were] accurate."

Twice during the interview, the defendant stated that he was willing to take a lie detector test, but no such test ever was conducted. Toward the end of the interview, after telling the defendant that he felt that there was something that the defendant wanted to get off of his chest, Karasik stated that the defendant could call Karasik at any time and leave a message if he recalled anything. Thereafter, the other detective stated that K had given them "a completely credible account of what occurred," and that "[t]he next time we'll be in touch . . . will be to arrest you. Is that what you want? Be honest with us now. Cause you got two choices." The defendant responded: "Good luck . . . you guys are beyond [the] statute of limitations." The detectives then informed the defendant that the applicable statute of limitations was thirty years. The defendant thereafter ended the interview.

The defendant was arrested on March 26, 2023, at which time he was advised of his *Miranda* rights, and

subsequently he was charged in an amended substitute long form information with sexual assault in the fourth degree in violation of § 53a-73a (a) (1) (A) and risk of injury to a child in violation of § 53-21 (a) (2). Both charges stemmed from the April, 2013 incident. A two day jury trial followed,[6] at which the state presented testimony from K, Karasik, and K's mother, and submitted three exhibits into evidence: the videotape of the defendant's police interview, a photograph of how K looked when she was eight years old, and a physician's note showing that K had asthma.

K and her mother provided their accounts of the events, and Karasik testified about the defendant's videotaped interview, which was played in its entirety for the jury. Immediately thereafter, the prosecutor asked Karasik: "[D]id the defendant ever give you a reason why he thought the victim gave—or the complainant . . . strike that. Your Honor, I apologize—[the] complainant gave you any other reason why this could have happened, why she made these allegations?" Defense counsel objected to this question on the ground that the question called for speculation. The prosecutor offered to clarify the question, and the court responded by telling the prosecutor to ask the question again. The prosecutor subsequently asked Karasik: "[D]id the defendant *ever* offer up a reason why the complainant made these allegations?" (Emphasis added.) Defense counsel objected again, this time on the grounds that the question was "[a]sked and answered of the complainant," and that it was being asked "to augment [K's] testimony." The court overruled defense counsel's objection, and Karasik answered: "No." The state then concluded its direct examination of Karasik.

---

[6] The evidence portion of the trial commenced and ended on June 13, 2023, and, on June 15, 2023, counsel made their closing arguments and the court instructed the jury, which returned its verdict that day.

The defendant did not present any testimony and submitted one exhibit into evidence, which consisted of a police report concerning K's allegations.[7] At the conclusion of trial, the jury found the defendant guilty of both charges. On August 25, 2023, the court, *Papastavros, J.*, sentenced the defendant to a total effective term of ten years of incarceration, execution suspended after three years, followed by ten years of probation. It also ordered the defendant to register as a sexual offender for life. Four days prior to sentencing, on August 21, 2023, the defendant filed a motion for a new trial. In that motion, he asserted that a new trial was warranted for a number of reasons, including because the "state presented inadmissible evidence about [his] . . . post-*Miranda* silence." The court denied the motion, and this appeal followed. Additional facts and procedural history will be set forth as necessary.

On appeal, the defendant claims, inter alia, that the state violated the proscriptions set forth in *Doyle* when the prosecutor asked Karasik whether the defendant "ever" had given a reason as to why K made the allegations of sexual assault. Although defense counsel objected to the prosecutor's question, he did so on evidentiary grounds and did not assert a *Doyle* violation before the trial court. The defendant, therefore, seeks review of his unpreserved *Doyle* claim pursuant to *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989),

---

[7] In the report, Officer Tangney recounts the details of his interview with K's mother, who told him about her conversation with K and K's allegations of inappropriate touching by the defendant. After setting forth the details of the incidents of alleged abuse described to him, Tangney noted the incident that occurred on October 29, 2020, when K lied to her mother about taking the bus home from school and her mother punished her by taking K's cell phone away from her. The report references K's statement to her mother about her sexual orientation, and that K's mother "was very accepting but felt her daughter may be telling her this just to get her phone back. Upon hearing the [allegations of inappropriate touching by the defendant] from her daughter, [K's mother] also thought [K] could be attempting to have her phone returned to her."

as modified by *In re Yasiel R.*, 317 Conn. 773, 781, 120 A.3d 1188 (2015). "Under *Golding*, a defendant can prevail on a claim of constitutional error not preserved at trial only if *all* of the following conditions are met: (1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation . . . exists and . . . deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt." (Emphasis in original; internal quotation marks omitted.) *State* v. *Washington*, 345 Conn. 258, 267, 284 A.3d 280 (2022). We conclude that the defendant's *Doyle* claim is of constitutional magnitude; see *State* v. *Smith*, 180 Conn. App. 181, 195, 182 A.3d 1194 (2018) (claim that state violated defendant's right to remain silent is of constitutional magnitude); and that the record is adequate to review the alleged claim of error, as the record demonstrates that the defendant received a *Miranda* warning at the time of his arrest, and the *Doyle* claim relates, at least in part, to the defendant's silence during a time period after the *Miranda* warning was given. See *State* v. *Griffin*, 232 Conn. App. 866, 882, 337 A.3d 1211 (2025) ("[a]s a factual predicate to an alleged *Doyle* violation, the record must demonstrate that the defendant received a *Miranda* warning prior to the period of silence that was disclosed to the jury" (internal quotation marks omitted)), petition for cert. filed (Conn. June 20, 2025) (No. 240408); see also *State* v. *Patrick M.*, 344 Conn. 565, 583 n.6, 280 A.3d 461 (2022) (because "it [was] undisputed that the defendant received *Miranda* warnings at the time of his arrest . . . any reference to the defendant's postarrest silence also was a reference to his post-*Miranda* silence"). We therefore will review the merits of the defendant's claim.

Next, we must ascertain whether a constitutional violation exists that deprived the defendant of a fair trial. To answer that question, we must determine whether the prosecutor's question constituted an impermissible reference to the defendant's post-*Miranda* silence. The following legal principles guide our analysis.

"In *Doyle* v. *Ohio*, supra, 426 U.S. 610, the United States Supreme Court held that the impeachment of a defendant through evidence of his silence following his arrest and receipt of *Miranda* warnings violates due process. See id., 611, 619. In reaching its conclusion, the court in *Doyle* v. *Ohio*, supra, 617–19, reasoned, first, that silence in the wake of *Miranda* warnings is insolubly ambiguous and consequently of little probative value, and, [s]econd . . . [although] it is true that the *Miranda* warnings contain no express assurance that silence will carry no penalty, such assurance is implicit to any person who receives the warnings. . . . *State* v. *Bell*, 283 Conn. 748, 765, 931 A.2d 198 (2007); accord *State* v. *Patrick M.*, [supra, 344 Conn. 582]. In a subsequent case, the United States Supreme Court went on to explain that [t]he point of the *Doyle* holding is that it is fundamentally unfair to promise an arrested person that his silence will not be used against him and thereafter to breach that promise by using the silence to impeach his trial testimony. *Wainwright* v. *Greenfield*, 474 U.S. 284, 292, 106 S. Ct. 634, 88 L. Ed. 2d 623 (1986).

"Although *Doyle* explicitly prohibits *impeachment* of a defendant with evidence of his post-*Miranda* silence, [our Supreme] [C]ourt has extended the *Doyle* rationale to conclude that due process is also violated when the state uses evidence of a defendant's post-*Miranda* silence as *affirmative proof* at trial . . . . *State* v. *Plourde*, 208 Conn. 455, 468, 545 A.2d 1071 (1988), cert. denied, 488 U.S. 1034, 109 S. Ct. 847, 102 L. Ed. 2d 979 (1989); accord *State* v. *Montgomery*, 254 Conn. 694, 714,

759 A.2d 995 (2000).'' (Emphasis in original; internal quotation marks omitted.) *State* v. *Washington*, supra, 345 Conn. 267–68. "Use of a defendant's pre-*Miranda* silence, by contrast, does not raise the same constitutional concerns: evidence of prearrest, and specifically pre-*Miranda*, silence is admissible to impeach the testimony of a defendant who testifies at trial, since the rule of *Doyle* . . . is predicated on the defendant's reliance on the implicit promise of *Miranda* warnings. *State* v. *Angel T.*, 292 Conn. 262, 286 n.19, 973 A.2d 1207 (2009); see *Jenkins* v. *Anderson*, 447 U.S. 231, 240, 100 S. Ct. 2124, 65 L. Ed. 2d 86 (1980) (if [t]he failure to speak occurred before the [defendant] was taken into custody and given *Miranda* warnings . . . [then] the fundamental unfairness present in *Doyle* is not [implicated], and impeachment by use of prearrest silence does not violate the [f]ourteenth [a]mendment).'' (Citation omitted; internal quotation marks omitted.) *State* v. *Patrick M.*, supra, 344 Conn. 583. "The defendant bears the burden of proving that a *Doyle* violation occurred. . . . If the defendant fulfills his burden, then the state assumes the burden of demonstrating that the constitutional error was harmless beyond a reasonable doubt.'' (Citations omitted; internal quotation marks omitted.) Id., 588.

In support of his claim that the prosecutor improperly asked a question and elicited testimony about his post-*Miranda* silence, in violation of *Doyle*, the defendant contends that, although he was interviewed by the police months prior to his arrest, "[the] improper question was not limited to [the] one hour and [fifteen] minute interview. The reason is because the prosecutor used the word '*ever*.' . . . 'The jury would have naturally and necessarily interpreted the answer to include the entire period after the defendant became aware of the allegations, including the twenty-seven months between the defendant's arrest and trial. Certainly, the

jury would have inferred that the use of the word "ever" included more than just the video recorded interview. The jury had already seen the interview—it did not need to be informed that the defendant did not provide an explanation for the allegations during the interview. The natural interpretation of the prosecution's question is that it went beyond what the jury had seen and was asking whether the defendant "ever" provided such an explanation.' " (Emphasis altered.) The state, citing *State* v. *Jeffrey*, 220 Conn. 698, 721, 601 A.2d 993 (1991), cert. denied, 505 U.S. 1224, 112 S. Ct. 3041, 120 L. Ed. 2d 909 (1992),[8] counters these assertions by arguing that, "[i]n determining whether a prosecutor's ambiguous remarks refer to pre-*Miranda* silence or post-*Miranda* silence, this court draws the 'more probable' interpretation, given the context of the remarks." According to the state, the prosecutor's question "pertained to the defendant's silence during his police interview, at which he was not in custody and, therefore, had *not* received *Miranda* warnings," and that "it was more probable, given the context in which the prosecutor asked the question, that it would have been understood to refer to the defendant's prearrest silence, specifically, his silence in the police interview." (Emphasis in original.)

---

[8] In *Jeffrey*, our Supreme Court, in concluding that the defendant in that case had failed to establish a *Doyle* violation, stated: "On appeal, the defendant maintains that [a] . . . question [posed to him on cross-examination] should . . . have been excluded as an impermissible use of [his] postarrest silence. Although he acknowledges that it is not clear from the question whether the [prosecutor] was referring to the defendant's silence before or after he was arrested, he contends that the question reasonably could have been understood by the jury to encompass the defendant's postarrest silence. We agree that the question was ambiguous but believe that, given the context in which it was asked, it is more probable that it would have been understood to refer to the defendant's pre-arrest silence. The state's line of inquiry leading up to this question concerned the defendant's conduct when the police arrived at his home before they placed him under arrest." (Emphasis omitted.) *State* v. *Jeffrey*, supra, 220 Conn. 721.

These differing positions of the parties demonstrate the ambiguity[9] in the prosecutor's use of the word "ever." In *State* v. *Patrick M.*, supra, 344 Conn. 584, our Supreme Court recently addressed how to construe ambiguous remarks that reasonably can be interpreted to refer either to a defendant's pre-*Miranda* or post-*Miranda* silence. In *Patrick M.*, our Supreme Court concluded that the prosecutor's references to the defendant's silence in that case "were ambiguous because they were not confined to a defined point in time within the pre-*Miranda* period but, instead, referred generally to the defendant's delay in disclosing his version of events without limitation. That delay, when referenced by the prosecutor in an unspecified and, therefore, unrestricted manner, could reasonably have been understood to include both the four days of pre-*Miranda* silence and the much lengthier period between the defendant's arrest and his trial." Id. In light of those circumstances, the court adopted a "contextualized approach" for addressing such situations. Id., 586. "Under this approach, [b]oth the intent of the prosecutor and the character of the remarks are determined by reviewing the context in which they occur, and the burden of proving such intent is on the defendant. . . . The standard is strict; virtually any description of a defendant's silence following arrest and a *Miranda* warning will constitute a *Doyle* violation." (Citation omitted; internal quotation marks omitted.) Id. The court further concluded: "[T]o determine whether a *Doyle* violation occurred . . . we must analyze whether the language used [by the prosecutor was] manifestly intended to be, or was . . . of such a character that the jury would *naturally and necessarily* take it to be a comment on the [defendant's post-*Miranda*

---

[9] See *State* v. *Patrick M.*, supra, 344 Conn. 584 (citing *State* v. *Courtney G.*, 339 Conn. 328, 345–46, 260 A.3d 1152 (2021), for proposition that "prosecutorial statements are ambiguous if their meaning is unclear and susceptible to more than one reasonable interpretation").

silence]. . . . [I]n applying this test, we must look to the context in which the statement was made in order to determine the manifest intention [that] prompted it and its natural and necessary impact [on] the jury." (Emphasis in original; internal quotation marks omitted.) Id., 588.

Similarly, in the present case, the prosecutor failed to use language restricting the time period covered by his question to the police interview only and, thus, did not confine his question to a defined point in time within the pre-*Miranda* period. Because the word "ever" used in the question posed could be construed as referring to a time period that included both pre-*Miranda* and post-*Miranda* silence; see *State* v. *Patrick M.*, supra, 344 Conn. 584; we apply the contextualized approach set forth in *Patrick M.* in our determination of whether a *Doyle* violation occurred. We conclude that the question, when viewed in the context in which it was made, was of such a character that the jury naturally and necessarily[10] would have understood it to be a comment on the defendant's post-*Miranda* silence.[11]

Our determination is guided, in part, by our Supreme Court's decision in *State* v. *Silano*, 204 Conn. 769, 529 A.2d 1283 (1987). In *Silano*, the defendant argued on

[10] We note that the defendant utilizes the "naturally and necessarily" language from *State* v. *Patrick M.*, supra, 344 Conn. 588, in his appellate briefs. The state, on the other hand, does not refer to or rely on the language set forth in *Patrick M.* but, rather, refers in its appellate brief to the "more probable than not" language employed in *State* v. *Jeffrey*, supra, 220 Conn. 721, even though it does cite to *Patrick M.* generally regarding *Doyle* violations. The state has not raised any argument as to why *Patrick M.* should not apply to the present case. Even though we apply the test set forth in *Patrick M.*, we note that, under either test, our conclusion would be the same, as they both focus primarily on the context in which the challenged statement was made.

[11] In light of this conclusion, we need not determine whether the prosecutor's question was "manifestly intended to refer to the defendant's post-*Miranda* silence . . . ." *State* v. *Patrick M.*, supra, 344 Conn. 588.

appeal to our Supreme Court that the trial court improperly "allow[ed] the state to ask a question on cross-examination concerning [the defendant's] postarrest silence after *Miranda* warnings had been given . . . ." Id., 770–71. Specifically, the defendant claimed that he was denied due process "because the court allowed the state to cross-examine him about his failure to contact the police after the interrogation had ceased in order to correct [a] statement he had given to them. [Also] . . . the prosecutor commented about that failure during the state's final argument. The defendant characterize[d] th[e] issue as one involving postarrest silence, and the state characterize[d] it as one involving the permissible use of prior inconsistent statements to impeach credibility during cross-examination." Id., 778–79. Our Supreme Court concluded that "one of the prosecutor's questions on cross-examination was constitutionally improper . . . ." Id., 779. In particular, the state asked the defendant if he "ever again" contacted "the police to correct allegedly false statements he had made during the interrogation." (Internal quotation marks omitted.) Id.

On appeal, our Supreme Court concluded: "The state may impeach a defendant by cross-examination concerning a prior inconsistent statement made after arrest and the giving of *Miranda* warnings, even though such impeachment may call into question a defendant's silence about the truth when he made that prior inconsistent statement. *Anderson* v. *Charles*, 447 U.S. 404, 100 S. Ct. 2180, 65 L. Ed. 2d 222, reh. denied, 448 U.S. 912, 101 S. Ct. 27, 65 L. Ed. 2d 1173 (1980). Such an examination is allowed because it is impossible to 'bifurcate' a prosecutor's questions concerning inconsistency into those relating to facts contained in a prior statement and those concerning facts omitted therefrom. Id., 408–409. A prosecutor may not, however,

question a defendant about his silence after the interrogation has ceased, since a 'defendant may reassert his right to remain silent at any time, and if he ceases to answer questions, or to come forward with additional or correcting information after questions are no longer being asked of him, there is a reasonable possibility that he is relying upon that right.' . . . We conclude, therefore, that the question concerning the defendant's failure 'ever again' to contact the police, after he had been arrested and given a *Miranda* warning, was improper under the strictures of *Doyle.*" (Citation omitted.) *State* v. *Silano*, supra, 204 Conn. 780–81.

Likewise, in the present case, the prosecutor asked Karasik whether the defendant "ever" provided an explanation for why K made the allegations of sexual assault. The adverb "ever," used in this context, means "at any time . . . ." Merriam Webster's Collegiate Dictionary (11th Ed. 2003) p. 433. The question asked by the prosecutor contained no language limiting it to "any time" during the defendant's police interview.[12] Also,

---

[12] The present case is distinguishable from *State* v. *Devito*, 159 Conn. App. 560, 124 A.3d 14, cert. denied, 319 Conn. 947, 125 A.3d 1012 (2015), on which the state relies in support of its argument that the defendant cannot establish a *Doyle* violation resulting from the prosecutor's use of the word "ever" in his question to Karasik. In *Devito*, the defendant claimed "that his due process right to a fair trial was violated when the court improperly admitted testimony regarding his post-*Miranda* silence at the police station" following his arrest for operating a motor vehicle while under the influence of intoxicating liquor or drugs. Id., 567. The prosecutor in *Devito* questioned state police troopers on the witness stand by asking if the defendant "*ever* denied driving [his] vehicle during the course of the evening" when he was arrested. (Emphasis added.) Id., 570. The defendant argued that the question could have been understood by the jury as implicating his post-*Miranda* silence. This court disagreed, concluding, inter alia, that, given the context in which the question was asked, "it [was] more probable that it would have been understood to refer to the defendant's prearrest silence," as the trooper's "testimony was primarily focused on the defendant's conduct during the traffic stop," and "the state's line of inquiry leading up to the question related only to the defendant's conduct at the scene rather than at the [police] barracks." (Emphasis omitted.) Id., 572. With respect to testimony from two other troopers, this court concluded that their testimony did not implicate the defendant's post-*Miranda* silence, as one trooper testified "only as

the question was asked after the jury had just finished viewing the videotape of the interview, during which the defendant, numerous times, emphatically denied the allegations of sexual assault and, aside from speculating—at the detectives' invitation—about a few reasons why K may have done so, stated repeatedly that he did not know why K made the allegations. Because the jury had just viewed the videotape of the interview, it was aware of the position taken by the defendant during his pre-*Miranda* interview. Moreover, the fact that the defendant did offer some explanations during the interview as to why K may have made the allegations further supports a determination that the question posed by the prosecutor necessarily would have covered a time period after the interview, which included the defendant's post-*Miranda* silence. Significantly, toward the end of the interview, after Karasik told the defendant that he felt that there was something that the defendant wanted to get off of his chest, Karasik stated that the defendant could call Karasik at any time and leave a message if he recalled anything. With that in mind, the jury naturally and necessarily would have viewed the question posed by the prosecutor, immediately following its viewing of the interview, as referring to a time period following the interview and up to trial, which, at least in part, pertained to the defendant's post-*Miranda* silence.

As our Supreme Court has made clear, "[t]he standard is strict; virtually any description of a defendant's silence following arrest and a *Miranda* warning will constitute a *Doyle* violation." (Internal quotation marks omitted.) *State* v. *Patrick M.*, supra, 344 Conn. 586.

to events that transpired during the traffic stop," and the other trooper's testimony was limited to the defendant's silence during the traffic stop, as the prosecutor had used the phrase "during that time" in reference to when the trooper had approached the defendant's vehicle. (Emphasis omitted; internal quotation marks omitted.) Id., 571. These circumstances differ from those of the present case, as we explain in this opinion.

Consequently, we conclude that the prosecutor's question to Karasik of whether the defendant "ever" offered an explanation for K's allegations, when viewed in the context in which it was made, violated the proscriptions of *Doyle* in that, by posing that question and eliciting the response, the prosecutor improperly used the defendant's post-*Miranda* silence against him. See *State* v. *Patrick M.*, supra, 591; see also *Griffin* v. *California*, 380 U.S. 609, 615, 85 S. Ct. 1229, 14 L. Ed. 2d 106 (1965) (fifth amendment to federal constitution "forbids . . . comment by the prosecution on the accused's silence"); *State* v. *A. M.*, 324 Conn. 190, 200, 152 A.3d 49 (2016) ("[t]he fifth amendment prohibits the state from forcing the defendant to be a witness against himself, and the United States Supreme Court has concluded that this protection also prohibits prosecutors from commenting at trial on the defendant's decision not to testify"); *State* v. *Carlson*, 226 Conn. App. 514, 537, 318 A.3d 283 ("fifth amendment to the United States constitution protects a defendant's right not to testify and prohibits comments on a defendant's silence"), cert. denied, 350 Conn. 911, 324 A.3d 143 (2024). When a prosecutor's remarks violate *Doyle*, they are regarded as "fundamentally unfair, in violation of [a] defendant's fourteenth amendment right to due process." (Internal quotation marks omitted.) *State* v. *Patrick M.*, supra, 592. Accordingly, we conclude that the defendant has established the existence of a constitutional violation that violated his due process right to a fair trial for purposes of the third prong of *Golding*.

This conclusion, however, does not end our inquiry. Next, we must address the fourth prong of *Golding* concerning the harmfulness of the *Doyle* violation. See id. ("*Doyle* violations are subject to harmless error analysis"). Under the fourth prong of *Golding* and when, as here, the error involves a constitutional violation, "[t]he state bears the burden of demonstrating that the

constitutional error was harmless beyond a reasonable doubt. . . . That determination must be made in light of the entire record [including the strength of the state's case without the *Doyle* violation]." (Internal quotation marks omitted.) Id. "Whether an error is harmful, as always, depends on its impact on the trier of fact and the result of the case." Id.; see also *State* v. *A. M.*, supra, 324 Conn. 204 ("[t]he focus of our harmless error inquiry is on whether the state has demonstrated that the [error] did not influence the outcome of the trial").

"A *Doyle* violation may, in a particular case, be so insignificant that it is clear beyond a reasonable doubt that the jury would have returned a guilty verdict without the impermissible question or comment [on] a defendant's silence following a *Miranda* warning. Under such circumstances, the state's use of a defendant's [post-*Miranda*] silence does not constitute reversible error. . . . The [error] has similarly been [found to be harmless when] a prosecutor does not focus [on] or highlight the defendant's silence in his cross-examination and closing remarks and [when] the prosecutor's comments do not strike at the jugular of the defendant's story. . . . The cases [in which] the error has been found to be prejudicial disclose repetitive references to the defendant's silence, reemphasis of the fact [during] closing argument, and extensive, [strongly worded] argument suggesting a connection between the defendant's silence and his guilt." (Internal quotation marks omitted.) *State* v. *Patrick M.*, supra, 344 Conn. 592.

In *State* v. *Patrick M.*, supra, 344 Conn. 592, our Supreme Court, after finding a *Doyle* violation, engaged in a harmless error analysis and concluded: "The state's harmless error argument erroneously focuses exclusively on the rebuttal argument and fails to consider the impact of the similar remarks the prosecutor made during his initial argument. It argues that the 'single

*Doyle* violation during rebuttal argument was harmless' but does not explain how the prosecutor's repeated emphasis on the defendant's post-*Miranda* silence during initial closing argument, which struck at the jugular of the defendant's exculpatory story that [his wife] was killed during the course of a robbery, was harmless beyond a reasonable doubt. We therefore conclude that the state has failed to fulfill its burden of demonstrating harmlessness." Id., 592–93. After viewing the entire record in the present case, we reach a similar conclusion.

Here, the state contends that, "even if this court were to determine that the state had violated *Doyle*, any such violation was harmless beyond a reasonable doubt." In support of this contention, the state argues that the prosecutor's question was "infrequent," and that "the state never returned to the subject of the defendant's post-*Miranda* silence during closing or rebuttal argument. . . . At no point during closing or rebuttal argument did the prosecutor reference or comment on the defendant's decision not to testify during the trial." The state also asserts that the prosecutor's question "did not affect the defendant's defense that K fabricated the allegations . . . [or] that K had motivation to lie about the sexual assault because she had her phone taken away by her mother that same month." Finally, the state argues that the prosecutor's "singular question . . . did not 'strike at [the] jugular' of the defendant's silence after his arrest" and that the state presented strong evidence of the defendant's guilt. (Emphasis omitted.) We do not agree with the state's contentions that it "never returned to the subject of the defendant's post-*Miranda* silence during closing or rebuttal argument," that the *Doyle* violation did not relate to or have an impact on the defendant's theory of defense, and that the state presented a strong case against the defendant. Accordingly, we conclude that the state has not met its

burden of demonstrating that the *Doyle* violation was harmless beyond a reasonable doubt.

First, following our review of the entire record, which necessarily includes comments made by the prosecutor during closing and rebuttal arguments;[13] see *State* v.

[13] Although we do not review the merits of the defendant's second *Doyle* violation claim concerning a comment made by the prosecutor during closing argument, we take that comment into consideration in our analysis of harm. Specifically, during closing argument the prosecutor discussed K's testimony about the alleged sexual assault and stated in part: "You may look at the fact that . . . K was isolated and alone in the home, and . . . point that toward intent. You may use the fact that the defendant pursued . . . K from one couch to another couch as an intentional act, and you may definitely use the fact that he manipulated his fingers to determine sexual gratification and intent. For a man to place his hands down an eight year old child's pants, inside her underwear, who isn't a doctor, who doesn't verbalize what his meaning in doing it is, you may find that that was an intentional act for sexual gratification. *That testimony is unrefuted.*" (Emphasis added.) The defendant argues that the italicized comment "planted in the jury's mind that the defendant's decision to not testify at his trial meant that he was guilty or [that he] should have taken the witness stand to prove his innocence." Our Supreme Court addressed a similar type of comment in *State* v. *Ruffin*, 316 Conn. 20, 26, 110 A.3d 1225 (2015). In *Ruffin*, the defendant claimed that "the prosecutor's no conflicting witness argument constituted an impermissible comment on the defendant's silence because the defendant alone [had] information to contradict [the victim] as to [her allegations of] sexual abuse." (Internal quotation marks omitted.) Id. Although our Supreme Court ultimately disagreed with that claim, in part because "there were witnesses other than the defendant who could have, and did, contradict other aspects of the victim's allegations"; (emphasis omitted) id., 33; it "note[d] that, although the prosecutor did not comment on the defendant's failure to testify, '[a] prosecutor does take a risk whenever the "not contradicted" argument is made' . . . and that prosecutors generally should avoid taking this unnecessary risk . . . and avoid language that could be misinterpreted as a veiled comment on the defendant's failure to testify." (Citations omitted.) Id., 33–34. In the present case, the prosecutor made the comment after discussing K's testimony about the defendant's alleged sexual assault and arguing that, from the defendant's alleged conduct, as described by K, the jury could infer intent; thus, the comment that "[t]hat testimony was unrefuted" necessarily was a reference to K's testimony, in particular, her testimony that the defendant put his hand down her pants, inside her underwear. When we view the comment in the context in which it was made and with consideration of the fact that, in this case, the defendant was the only person who could contradict K's testimony about the alleged sexual assault that formed the basis for the two charges; see *State* v. *Walker*, 206 Conn. 300, 307–308, 537 A.2d 1021 (1988); we cannot ignore the possibility that the jury could have interpreted the remark as a "veiled comment on the defendant's

*Hamilton*, 352 Conn. 317, 337–38, 336 A.3d 1188 (2025); we conclude that, in addition to the *Doyle* violation that we have found, the prosecutor further highlighted the defendant's silence in his closing remarks to the jury.[14] For example, during rebuttal argument, the prosecutor stated in relevant part: "The defense wants you to believe that . . . K concocted this detailed story about the defendant sexually assaulting her over the mom's punishment over her phone. She didn't say mom did it. It's over a phone that mom took away. It wasn't a phone that the defendant took away. . . . So, let's talk about the interview. You have no evidence there was anything wrong with that interview. . . . [L]et's look at what the defendant told you. . . . He told you that . . . K was right, that they did live in three different homes, that he was her stepdad. . . . [O]ne thing I can say about that interview is that . . . Karasik was right all along; the defendant had something he wanted to say, but he didn't want to say it. All he said, first thing he wanted to say is, nope, it didn't happen. Nope it didn't happen. And he said that a number of times, and I agree he said that a lot. Again . . . Karasik was like, you're trying to tell me something; you want to tell me something. . . .

"Did [the defendant] want to save his marriage? *He didn't tell you that.* Did he want to save his family? *He didn't* want to . . . *tell you that.* Did he want to save

---

failure to testify," which is the precise harm our Supreme Court cautioned can occur when prosecutors make such comments. *State* v. *Ruffin*, supra, 34.

[14] We note that, although the defendant refers to these remarks in his appellate briefs, he has not claimed that they are separate *Doyle* violations; thus, we do not determine whether they constitute *Doyle* violations. Nevertheless, "the various instances in which the prosecutor mentions [postarrest] silence informs this [c]ourt's analysis as to the prejudicial effect on the jury. See *Brecht* [v. *Abrahamson*, 507 U.S. 619, 641, 113 S. Ct. 1710, 123 L. Ed. 2d 353 (1993)] (adopting *Kotteakos* v. *United States*, 328 U.S. 750, 762, 66 S. Ct. 1239, 90 L. Ed. 1557 (1946)) (finding that a [c]ourt on harmless error review should consider 'the proceedings in their entirety.')." *Jaradat* v. *Williams*, 591 F.3d 863, 868 n.3 (6th Cir. 2010).

his freedom? *He didn't want to tell you that.* He didn't make up a story. *He didn't tell you about the phone incident*, all right, a perfect example of something that might be an issue. All right. It's here today as something that you should disbelieve . . . K about. All right. *He didn't tell you that.*" (Emphasis added.)

In making these statements during his closing remarks to the jury and repeatedly using the word "you," the prosecutor was speaking, and referring, to the jury; he was not suggesting that the defendant did not tell Karasik these things during the pre-*Miranda* interview, as the state contends. During the course of this argument, the prosecutor stated five times that the defendant did not tell the jury those various reasons for K's allegations. The inevitable conclusion, therefore, is that these five statements repeatedly highlighted the defendant's failure to testify and undeniably implicated the defendant's post-*Miranda* silence.[15] Moreover, by commenting on the defendant's failure at trial to explain why K should be disbelieved, the prosecutor was effectively continuing to call attention to the defendant's failure to "ever" proffer an alternative explanation as to why K would have made her allegations.

This conclusion is further reinforced when the prosecutor's reference to the "phone incident" is considered in connection with the defendant's theory of defense at trial, made through cross-examination of witnesses, that K made up the allegations in an effort to gain access to her cell phone that had been taken away from her for one month as a punishment. When viewed in that light, the prosecutor's references to the defendant's theory of defense concerning the "phone incident," followed by statements that the defendant "didn't tell

---

[15] Although the defendant, in his principal appellate brief, does not label these remarks as constituting a separate *Doyle* violation, he does claim that the remarks amounted to prosecutorial improprieties that infringed on, inter alia, his right to remain silent and improperly referred to facts not in evidence.

you"—i.e., the jury—about the phone incident and a suggestion that the jury should disbelieve it, "strike at the jugular" of the defendant's theory of defense that K made up the allegations in an effort to get her cell phone back. (Internal quotation marks omitted.) *State* v. *Patrick M.*, supra, 344 Conn. 592. As the defendant aptly points out in his principal appellate brief: "There [was] no trial evidence that, during the [police interview], the defendant knew about the cell phone being seized by [K's] mother for a month as [a] punishment. There [was] no trial evidence [that] the defendant knew about [K's mother's] concerns that her daughter was lying when he voluntarily went to the police [interview]. The defendant may have learned about . . . K's mother's information about her daughter lying at some point after his public defender showed him the disclosed police report, which mentions it. . . . When the prosecutor argues that the defendant 'didn't tell' [the jury] about the phone incident, it naturally and necessarily caused the jury to believe he should have testified in order to tell [the jurors] he learned about the cell phone incident after he was [interviewed]. This constitutes indirect commentary on the defendant's decision not to testify and his right to remain silent." (Emphasis omitted.) We agree with the defendant.

As our Supreme Court has explained: "When the defendant chooses not to testify, he takes the risk that the jury will view his silence with skepticism—a prosecutor's explicit reminders to the jury of the defendant's decision serves only to heighten this risk, burdening the defendant's constitutional right to remain silent." *State* v. *A. M.*, supra, 324 Conn. 203. "[P]rosecutors should not be allowed to sidestep the *Doyle* protections by skirting the edge of the law with vague and imprecise references to a defendant's silence." (Internal quotation marks omitted.) *State* v. *Patrick M.*, supra, 344 Conn. 584–85.

Given that a determination of the harmfulness of the *Doyle* violation "must be made in light of the entire record [including the strength of the state's case without the *Doyle* violation]"; (internal quotation marks omitted) *State* v. *Patrick M.*, supra, 344 Conn. 592; we next examine the strength of the state's case. Our Supreme Court has "described a child sexual abuse case lacking conclusive physical evidence, when the prosecution's case rests on the credibility of the victim [as] not particularly strong, even when otherwise sufficient to support a conviction." (Internal quotation marks omitted.) *State* v. *Angel T.*, supra, 292 Conn. 293.[16]

In *State* v. *Patrick M.*, supra, 344 Conn. 593 n.8, our Supreme Court, in addressing the harmfulness of a *Doyle* violation, stated: "Although the evidence was sufficient to support the defendant's conviction . . . we disagree with the state that it was overwhelming. As we previously noted, there was no direct, physical, or forensic evidence implicating the defendant in [the] murder; instead, the state's case against the defendant was largely circumstantial, resting on the defendant's motive, means, and opportunity to commit the crime and his flight from the scene. At trial, the defendant testified that his flight was motivated by fear, rather than guilt, because someone else killed [the victim] during the course of a robbery in which a large quantity of money and illicit drugs was stolen. As to the identity

---

[16] We also note that, in the context of a prosecutorial impropriety claim, this court has stated: "[W]e must be mindful that [t]he sexual abuse of children is a crime [that], by its very nature, occurs under a cloak of secrecy and darkness. It is not surprising, therefore, for there to be a lack of corroborating physical evidence . . . . Given the rarity of physical evidence in [sexual assault cases involving children], a case is not automatically weak just because a child's will was overborne and he or she submitted to the abuse . . . . [Our Supreme Court has] never stated that the state's evidence must have been overwhelming in order to support a conclusion that prosecutorial [impropriety] did not deprive the defendant of a fair trial. . . . *State* v. *Courtney G.*, [339 Conn. 328, 365–66, 260 A.3d 1152 (2021)]." (Internal quotation marks omitted.) *State* v. *Henry B-A.*, 234 Conn. App. 197, 226, A.3d (2025).

of the perpetrator, the defendant raised a third-party culpability defense [that was] . . . a plausible, alternative theory of culpability. On the present evidentiary record, we cannot conclude that the evidence of the defendant's guilt was overwhelming or that the defendant's exculpatory story was transparently frivolous. See *State* v. *Brunetti*, [279 Conn. 39, 82–86, 901 A.2d 1 (2006)] (*Doyle* violation was harmless beyond reasonable doubt because defendant confessed to crime, police found clothing soaked in victim's blood in defendant's home, and defendant's exculpatory story that he removed his clothing and that someone else dipped it in victim's blood was transparently frivolous); *State* v. *Montgomery*, supra, 254 Conn. 718–20 (*Doyle* violation was harmless beyond reasonable doubt, in part because of overwhelming evidence of defendant's guilt, which consisted of eyewitness testimony identifying him as perpetrator with 100 percent certainty, his purchase of murder weapon, his confession to his cellmate, and discovery of other incriminating evidence in [his] car, including a knife, a can of Mace, latex gloves, duct tape, and an ice pick)." (Internal quotation marks omitted.) *State* v. *Patrick M.*, supra, 593 n.8

With these considerations in mind, we conclude that the state's case against the defendant in the present case was not particularly strong. See, e.g., *State* v. *Angel T.*, supra, 292 Conn. 292–95. In addition to the fact that there was no physical or medical evidence of the alleged incident of sexual abuse, no expert testimony was offered;[17] there was no evidence presented of behavioral changes by K following the incident in April, 2013; and

---

[17] We note that, although expert testimony is not required in a child sexual assault case, the state often presents such testimony. See *State* v. *Taylor G.*, 315 Conn. 734, 761, 110 A.3d 338 (2015) ("in cases that involve allegations of sexual abuse of children, we have held that expert testimony of reactions and behaviors common to victims of sexual abuse is admissible [because] . . . [s]uch evidence assists a jury in its determination of the victim's credibility by explaining the typical consequences of the trauma of sexual abuse on a child" (internal quotation marks omitted)).

K testified that, at times following that incident, she asked to go on long road trips with the defendant in which the two of them were alone in his car. See *State* v. *Patrick M.*, supra, 344 Conn. 593 n.8 (state's case against defendant was not overwhelming when there was no direct, physical, or forensic evidence implicating defendant in murder). The evidence submitted by the state consisted of K's testimony setting forth her account of what had occurred in April, 2013; the testimony of K's mother, which corroborated K's testimony in part that, at some point in time when K was a teenager, the defendant had climbed into and slept in a bed with K and K's mother, although that incident was not the basis for the charges against the defendant, and which also included her acknowledgement that she initially thought that K was just trying to get her cell phone back; the testimony of Karasik regarding his interview of the defendant, which the jury viewed in its entirety; a photograph of K when she was eight years old; and a doctor's note indicating that K suffers from asthma. The defendant submitted the police report into evidence, which referenced K's statement to her mother, made after her mother had taken her cell phone away from her for one month, about her sexual orientation, the fact that K's mother thought that K might be telling her about her sexual orientation "just to get her phone back," and that, upon hearing the allegations of inappropriate touching by the defendant from K, K's mother also thought that K "could be attempting to have her phone returned to her."

In *State* v. *Angel T.*, supra, 292 Conn. 263–64, our Supreme court addressed a claim of prosecutorial impropriety stemming from the conduct of the prosecutor in "eliciting evidence of, and commenting during summations about, the fact that the defendant . . . had obtained representation by an attorney during the police investigation of the crimes at issue." In doing so, it conducted an analysis under the factors set forth in *State* v. *Williams*, 204 Conn. 523, 540, 529 A.2d 653

(1987), concerning whether the prosecutorial impropriety deprived the defendant of his due process right to a fair trial; *State* v. *Angel T.*, supra, 292 Conn. 287–95; which we find instructive, especially with respect to its statements regarding the impact of the prosecutorial impropriety when the state's case involving a child sexual assault is not particularly strong. For example, the court concluded that the state's case, which consisted of the victim's testimony and testimony from the victim's mother and cousin, "was not sufficiently strong so as to not be overshadowed by the impropriety." Id., 293. As the court explained: "[A]lthough there exists evidence in the present case supporting the defendant's conviction despite the lack of direct physical evidence linking the defendant to the sexual assault of the victim—namely, the victim's testimony and the testimony of her mother and cousin—without independent physical evidence to prove that the defendant had sexually assaulted [the victim], or even that [the victim] had been sexually assaulted at all, the significance of the [prosecutor's] improper conduct increases considerably." (Internal quotation marks omitted.) Id. Our application of that reasoning to the present case, in which we similarly have determined that the state's case was not particularly strong and which also involves a credibility contest between the defendant and his accuser, leads us to an analogous conclusion regarding the impact of the *Doyle* violation.

The lack of physical evidence in the present case rendered the trial a credibility contest between K and the defendant. The harm resulting from the state's *Doyle* violation is compounded when considered in conjunction with other comments of the prosecutor during closing and rebuttal argument. See *State* v. *Hamilton*, supra, 352 Conn. 337–38 (trial court's improper admission into evidence of witness' two interviews with police, in which witness identified defendant as person in surveillance footage, was harmful, and that conclusion was

"buttressed by the way [the witness'] two interviews were used by the prosecutor during closing arguments"); *State* v. *Calderon-Perez*, 234 Conn. App. 228, 264,    A.3d    (2025) (harm resulting from court's exclusion of evidence in violation of defendant's constitutional right to present defense "could only have been compounded by" prosecutor's improper remarks in closing argument about excluded evidence); see also *State* v. *A. M.*, supra, 324 Conn. 203 (when prosecutor's comment "calls the jury's attention to the defendant's silence . . . such comment heighten[s] the jury's awareness of the defendant's silence, namely, his failure to answer to the state's charges" (internal quotation marks omitted)). That is, the *Doyle* violation, together with the prosecutor's other comments during closing and rebuttal arguments, conveyed and reinforced the idea that the defendant should not be believed because he never spoke up, either during the interview or at any time afterward, to provide a reasonable explanation for why K made her accusations against him.[18] As such, the harm went to the core of the defendant's theory

---

[18] Compare *State* v. *Hughes*, 45 Conn. App. 289, 296, 696 A.2d 347 (1997) ("trial court's improper admission of the evidence of the defendant's post-*Miranda* silence was not harmless beyond a reasonable doubt" when "evidence of the defendant's post-*Miranda* silence was brought up repeatedly during the examination of [a police detective] and was then referred to during closing argument," and "defendant's post-*Miranda* silence was consistently equated with his guilt," and because "defendant did not testify at trial, there was a 'reasonable possibility' that the repeated use of evidence of [his] post-*Miranda* silence as affirmative proof of his guilt and consciousness of guilt contributed to his conviction") and *State* v. *Crosby*, 34 Conn. App. 261, 270, 641 A.2d 406 ("In this case, the state questioned the defendant about his postarrest silence and then argued three times during its closing remarks that, since the defendant had remained silent prior to trial, he had had time to fabricate an exculpatory story. Thus, the state repeatedly highlighted the defendant's postarrest silence and linked this silence to the defendant's explanation at trial. As a result, a reasonable possibility exists that the impermissible questions and comments contributed to the defendant's conviction, and the *Doyle* violation was not harmless beyond a reasonable doubt."), cert. denied, 230 Conn. 903, 644 A.2d 916 (1994), with *State* v. *Montgomery*, supra, 254 Conn. 718–19 (concluding that *Doyle* violation was harmless beyond reasonable doubt because "prosecutor did not attempt repeatedly to introduce evidence of the defendant's silence . . . [or] men-

of defense, which was not "transparently frivolous." (Internal quotation marks omitted.) *State* v. *Patrick M.*, supra, 344 Conn. 593 n.8. Under such circumstances and in light of the entire record before us, which demonstrates that the state's case against the defendant was not strong, that the prosecutor, in addition to committing the *Doyle* violation, highlighted the defendant's post-*Miranda* silence multiple times during closing and rebuttal arguments, and that some of those references struck at the jugular of the defendant's theory of defense or suggested a connection between the defendant's silence and his guilt, we cannot conclude that the state's improper question and the detective's answer did not influence the outcome of the trial. Accordingly, the state has failed to meet its burden of proof that the *Doyle* violation was harmless beyond a reasonable doubt. See id., 592, 593 n.8; *State* v. *Hughes*, 45 Conn. App. 289, 296, 696 A.2d 347 (1997); *State* v. *Crosby*, 34 Conn. App. 261, 270, 641 A.2d 406, cert. denied, 230 Conn. 903, 644 A.2d 916 (1994).

The judgment is reversed and the case is remanded for a new trial.

In this opinion the other judges concurred.

tion that evidence during his closing argument," "prosecutor focused on the state's strong case against the defendant, including the incriminating responses that the defendant gave to the police before terminating the [police] interview," and "other evidence introduced by the state overwhelmingly demonstrated the defendant's guilt beyond a reasonable doubt"), *State* v. *Alexis*, 194 Conn. App. 162, 173–77, 220 A.3d 38 (any *Doyle* violation was harmless because "the evidence introduced by the state unrelated to the defendant's post-*Miranda* silence established the defendant's guilt beyond a reasonable doubt"), cert. denied, 334 Conn. 904, 219 A.3d 800 (2019); *State* v. *Bereis*, 117 Conn. App. 360, 379, 978 A.2d 1122 (2009) (*Doyle* violation was harmless beyond reasonable doubt in view of "substantial evidence of the defendant's guilt" and fact that reference to defendant's silence "did not strike at the jugular of the defendant's version of events and was not equated with the defendant's guilt"), and *State* v. *Pepper*, 79 Conn. App. 1, 16–17, 828 A.2d 1268 (2003) (any alleged *Doyle* violation was harmless beyond reasonable doubt because there was substantial evidence supporting defendant's guilt, including physical evidence tying defendant to victim, alleged *Doyle* violation was isolated, and there were no repeated references to defendant's silence), aff'd, 272 Conn. 10, 860 A.2d 1221 (2004).